903 F.2d 1440
 16 Fed.R.Serv.3d 1177
 Betty L. HATTAWAY, as duly appointed guardian of the person
and property of Noah Lee Laningham, Incompetent,
Plaintiff-Appellee,
v.
Quinn A. McMILLIAN, Individually and as Sheriff of Walton
County, Florida, Defendant-Appellant.
 No. 89-3208.
 United States Court of Appeals,
Eleventh Circuit.
 June 25, 1990.
 
 Julius F. Parker, Jr., Parker, Skelding, Labasky & Corry, Tallahassee, Fla., for defendant-appellant.
 Lynn C. Higby, Bryant, Higby & Williams, Panama City, Fla., for plaintiff-appellee.
 Appeal from the United States District Court for the Northern District of Florida.
 Before TJOFLAT, Chief Judge, ANDERSON and CLARK, Circuit Judges.
 CLARK, Circuit Judge:
 
 I. FACTS AND PRIOR PROCEEDINGS
 
 1
 On September 16, 1987, Noah Laningham and his brother Joe Laningham left the Hardees in DeFuniak Springs, Florida. The Hardees employees suspected that the brothers were too intoxicated to operate an automobile and notified the DeFuniak Springs Police Department. By the time the officers reached the Hardees, the Laningham brothers had left the restaurant. They were next spotted by a state wildlife official who radioed for assistance. Two Walton County Deputies and two DeFuniak Springs officers responded to the call. The situation quickly escalated into a high speed chase.
 
 
 2
 Quinn A. McMillian, the Walton County Sheriff, was in an unmarked radio car at the time that the chase began. From the radio traffic, he realized that the intoxicated drivers were proceeding towards his present location. McMillian then parked his car in the middle of the road facing the direction the Laningham car would be coming. McMillian's police car was parked with its blue police lights flashing. McMillian then stood in the front of his car to await the Laningham automobile.
 
 
 3
 A few minutes later the Laningham car raced by the Sheriff. After almost hitting him, the car swerved and went around the Sheriff's car. As the car sped by, McMillian drew his gun and shot at the Laningham car's tires. The car then swerved out of control and pulled over approximately one-fourth of a mile from where McMillian was standing. Both of the brothers jumped out of the car. Joe Laningham was apprehended almost immediately. Noah, however, ran into the woods. The officers pursued him into the woods and finally apprehended him several hundred yards from the parked cars. At this time Laningham who appeared to be unconscious, was then handcuffed. Apparently because of the heat of the day, the Sheriff asked for some water or a hose. A garden hose with a pistol grip spray nozzle was brought to the Sheriff from a nearby farm house.
 
 
 4
 At this point in the incident, the eyewitnesses disagree on what happened next. Sheriff McMillian and several of the other witnesses testified that the Sheriff sprayed a fine mist over Noah Laningham and attempted to get him to drink some of the water. These witnesses testified that the entire incident took from one to six minutes. Several of these witnesses testified that the nozzle was never placed into Laningham's mouth, and that any water that Laningham received to drink was provided in the form of a fine mist from the hose.
 
 
 5
 The plaintiff presented quite a different story. Tracy Laird testified that the Sheriff took the hose and forced water into Laningham's mouth at a pressure so high that his cheeks fluttered. Laird also testified that the water shot out of Laningham's nose and caused his stomach to heave up and down so that he looked like he was having convulsions. In addition, the plaintiff also presented the testimony of Florida Department of Law Enforcement Special Agent Ken Bridges who recounted the following conversation he had with the Sheriff:
 
 
 6
 The Sheriff told me ... that he had gotten involved in an arrest where a vehicle was being chased ... and then when the car pulled down the road and had stopped [one of the] passengers had jumped out ... and led them on quite a lengthy foot chase through the woods. They finally caught him ... and brought him out near a house, and it was hot that day and he was sweaty. So he told one of the bystanders ... to bring him the hose.... He got the hose and wet the boy down. The boy wasn't responsive. He would ask him who he was and what he was doing, and he wasn't responding. He was also not moving, not getting up, not doing anything. So he told him to get up and he forced some water in his mouth and the boy didn't respond to that. So he said, in his words, I stuck the hose in his mouth again and gave him a good squirt and told him if he didn't get up, I was going to drown him.
 
 
 7
 Trial Transcript at 179-80 (emphasis added). Similarly, Officer Rayburn of the DeFuniak Springs Police gave the following testimony on cross-examination:
 
 
 8
 Q. Now as I understand, Mr. Rayburn, the Sheriff took the nozzle ... and stuck it down [Laningham's] britches in his genital area?
 
 
 9
 A. I would say he stuck it under his belt. I wouldn't say to the genital area.
 
 
 10
 Q. How far was it from his genital area did he spray?
 
 
 11
 A. I have no idea.
 
 
 12
 Q. But it was below the belt?
 
 
 13
 A. It was under the belt.
 
 
 14
 Q. And it was in the front?
 
 
 15
 A. Right.
 
 
 16
 Q. And that's the genital area; right?
 
 
 17
 ....
 
 
 18
 A. I suppose.
 
 
 19
 Q. Now, give us a little flavor for the amount of pressure that was coming out of the Plaintiff's Exhibit 1 there when he would stick the nozzle up to his lips?
 
 
 20
 A. With my hand not being on the nozzle I don't know how much force was there. As I said before, there was enough force that you noticeably see the water going into his mouth by the movement of his cheeks.
 
 
 21
 Q. Cheeks were fluttering?
 
 
 22
 A. Cheeks were a little fluttering, yes, and there was water coming out of the corner of his mouth.
 
 
 23
 Trial Transcript at 666 (emphasis added).
 
 
 24
 After the hosing incident, Laningham was taken to the Walton County Jail. He received medical treatment at the jail and was later transferred to a hospital. Although there was some testimony that Laningham was talking and walking around the jail following the hosing incident, some time after the incident Laningham lapsed into a mute and catatonic state. One of Laningham's doctors diagnosed his condition as a post traumatic stress disorder. Another testified that he has a combination of depression and psychosis. The plaintiff's experts testified at trial that Laningham's condition was most likely caused by the hosing incident described by the plaintiff's witnesses. Both sides' experts agreed, however, that the defendant's version of the hosing incident would not have been likely to cause his injuries. Laningham's condition prevented him from attending the trial. The estimate for the costs of Laningham's future treatment is 3.3 million dollars at today's costs.
 
 
 25
 Betty L. Hattaway was appointed as Laningham's guardian. On October 26, 1987 she gave notice to McMillian that she intended to bring an action against him for Laningham's injuries. On October 27, 1987, she filed a multi-count complaint in the United States District Court for the Northern District of Florida alleging several state and federal causes of action.[1]
 
 
 26
 After hearing the testimony presented by both parties, the case was submitted to a jury. The jury was furnished separate special interrogatory verdict forms for each of the four counts of the complaint. The jury found in favor of Sheriff McMillian on all federal claims, on the state claim alleging assault and battery and on the state claim alleging intentional infliction of extreme emotional distress. Only on the pendent claim alleging negligence did the jury find in favor of the plaintiff. On that count, the jury found the plaintiff 75% negligent and defendant McMillian 25% negligent. The jury assessed total damages of $2,000,000 which, pursuant to the doctrine of comparative negligence, was reduced to a judgment of $500,000. In addition, the judgment was amended by the district court to clarify that the plaintiffs could recover only against the Sheriff in his official capacity.[2]
 
 
 27
 The defense filed several post-trial motions seeking to overturn the redirect and reduce the damages. The plaintiff, on the other hand, filed a motion for an additur or, in the alternative, a new trial on the issue of damages. The court denied the defense motions but granted the plaintiff's motion for additur, giving the defendant the choice of either accepting an additional $343,603 added to the judgment or facing a new trial on the issue of damages. McMillian accepted the additur subject to all rights of appeal and the judgment was increased to $843,603 consistent with additur. This appeal followed.
 
 
 28
 On appeal the defendant asserts five challenges to the judgment. First, the defendant argues that the district court erred by not granting judgment in the defendant's favor because the plaintiff failed to comply with the Florida notice of claim provisions which are a prerequisite to the state's waiver of sovereign immunity. Second, the defendant argues that the jury's verdicts are inconsistent with each other. The defendant's third argument is that the plaintiff's evidence was insufficient to allow the jury to find that the defendant was the proximate cause of Laningham's injuries. Fourth, the defendant argues that the additur ordered was excessive and therefore was an abuse of discretion. Finally, the defendant argues that the district court erred in not granting the defendant's motion to limit damages to $100,000. We now consider each of these claims.
 
 II. DISCUSSION
 
 29
 A. Compliance with the Florida Notice of Claim Procedures
 
 
 30
 Appellant's first claim is that the district court erred in failing to grant the defendant's motion for a directed verdict. In that motion the defendant alleged the plaintiff had failed to prove compliance with the Florida notice of claim provisions. Section 768.28 of the Florida Code contains a limited waiver of sovereign immunity applicable to the appellee's suit against Sheriff McMillian. The section provides:
 
 
 31
 An action may not be instituted on a claim against the state or one of its agencies or subdivisions unless the claimant presents the claim in writing to the appropriate agency, and also ... presents such claim in writing to the Department of Insurance, within 3 years after such claim accrues and the Department of Insurance or the appropriate agency denies the claim in writing.... The failure of the Department of Insurance or the appropriate agency to make final disposition of a claim within 6 months after it is filed shall be deemed a final denial of the claim for purposes of this section.
 
 
 32
 Fla.Stat. Sec. 768.28(6)(a) (1986), amended, 1988 Fla.Laws Ch. 88-173, Sec. 2 (effective Oct. 1, 1988).[3]
 
 
 33
 The plaintiff alleged compliance with these provisions in her complaint. She did not, however, comply with the strict requirements of the statute since she filed the suit the day after giving the required notice instead of waiting the six months required by the section. Thereafter, the defendant raised noncompliance with the statute as an affirmative defense in his answer.
 
 
 34
 Approximately seven months after the notice had been given, the plaintiff filed a motion to strike the defense as insufficient as a matter of law. Plaintiff argued that failure to comply with the six month notice requirement was now moot since six months had elapsed since she had provided notice. In her motion the plaintiff cited this court's opinions in Fitzgerald v. McDaniel, 833 F.2d 1516 (11th Cir.1987) and Lundgren v. McDaniel, 814 F.2d 600 (11th Cir.1987). The district court granted the plaintiff's motion to strike the defense relying only on this court's opinion in Fitzgerald.
 
 
 35
 Approximately two months after the district court's order, the defendant filed a motion asking that the affirmative defense be reinstated based upon Felder v. Casey, 487 U.S. 131, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988).[4] The district court denied this motion without filing an opinion. The case then proceeded to trial. At the close of the plaintiffs's case and at the close of all evidence, the defendant moved for a directed verdict alleging that noncompliance with section 768.28(6) mandated judgment in his favor. Both motions were denied. The defendant renewed these objections in his motion for judgment notwithstanding the verdict which was also denied. The defendant now appeals these denials.
 
 
 36
 Initially, it is important to note the narrow issue involved in this appeal. The defendant does not claim that he did not receive the required notice--nor could he as the record reflects notice was given on October 26, 1987, the day before the suit was filed. McMillian's argument is that plaintiff did not wait the required six months before bringing the suit. The defendant argues that because the plaintiff did not wait the required length of time before filing suit, she could not prove compliance with the statute at trial.
 
 
 37
 To resolve the issues raised by this defense, it is necessary to first examine section 768.28(6) as interpreted by this court and the Florida courts. Thereafter, the court will examine whether the Supreme Court's opinion in Felder changes the way this court must interpret the Florida provisions. We begin with an analysis of our decisions interpreting the provision.[5]
 
 
 38
 This court has considered the Florida notice of claim provision on two prior occasions. Both of these cases were relied on in support of the plaintiff's motion to strike the section 768.28 defense. In Lundgren v. McDaniel, this court first addressed the issue. In Lundgren, the district court had refused to dismiss the complaint for failure to follow the Florida notice of claim provision.[6] Rather than dismiss the action, the district court allowed the plaintiff to refile an amended complaint that alleged compliance with the statute after the six month waiting period had expired. 814 F.2d at 605. After the jury awarded damages to the plaintiff, the defendant appealed. On appeal, the Lundgren defendants contended that Florida law required the court to dismiss the case without prejudice. This court, however, rejected the defendants' argument and affirmed. Id. at 606-607.
 
 
 39
 The Lundgren court first noted that the defendants' argument was based upon their assumption that Florida law controlled the question. The court rejected this assumption, and after applying the analysis required by Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), held that federal law "governs the procedural question of whether to wait six months and permit the filing of an amended complaint or to dismiss the original complaint." Lundgren, 814 F.2d at 606. Under federal law, this decision is committed to the discretion of the district court. Id. The court recognized that under some instances the requirements of section 768.28(6) "may well be substantive," but found it unnecessary to decide the issue.[7] Id. The Lundgren court hinted that if it were to apply Florida law, it would reach the same result.[8] Id. at 606-607.
 
 
 40
 In addition to the argument regarding the notice provision, the defendants in Lundgren argued that the district court erred in allowing the plaintiff to reopen her case to prove compliance with section 768.28(6). The district court allowed the plaintiff the opportunity to prove compliance after the defendants argued that the plaintiff had failed to do so. This court rejected the defendants' argument that the district court's actions were contrary to Florida law because it found that this issue was governed by federal law which gives the district court the discretion to make the decision whether to allow a party to reopen his case. Id. at 607. Finally, the court rejected the state law basis of the defendant's claim.[9]
 
 
 41
 In Fitzgerald v. McDaniel, this court addressed section 768.28(6) for a second time. In Fitzgerald, the plaintiff filed suit in federal court alleging negligence against another Florida sheriff. The suit was filed after notification of the claim but before the full six month waiting period had expired. The defendants argued that the failure to comply with the notify and wait provision should have resulted in the suit being dismissed. The district court rejected this argument and held that the failure to comply with the statute was mooted by the passage of six months after the required notice was given. 833 F.2d at 1519. This court affirmed based upon the district court's interpretation of state law. Id. at 1519-20.
 
 
 42
 The court in Fitzgerald noted that the district court reasoned:
 
 
 43
 ... that it would serve no useful purpose to dismiss the complaint, for such a dismissal clearly must be without prejudice and with leave to amend. [Footnote omitted.] Since there would be no need to amend in light of the fact that all conditions precedent to instituting an action have now been met, the plaintiff would only need to refile his original complaint. I note that if the defendants were able to articulate some actual prejudice that resulted from the plaintiff's failure to wait six months before filing suit, I would be more inclined to dismiss the case and require the plaintiff to comply strictly with the language of Section 768.28(6).
 
 
 44
 Fitzgerald, 833 F.2d at 1520 n. 2 (citing district court order). Thus, the district court's actions in this case have been approved by a prior panel of this court based entirely on state law. The district court in the instant case relied exclusively on Fitzgerald.
 
 
 45
 The defendant argues in this court that both Lundgren and Fitzgerald are inconsistent with the way the Florida courts would treat this issue. The district court noted that it was bound by Fitzgerald. As we have noted above, we are similarly bound as the decision has not been overruled by an en banc panel of this court. In addition, there have been no post-Fitzgerald Florida state cases that an any way overrule this case or cast doubt on the correctness of the decision.
 
 
 46
 In addition, we note that neither Fitzgerald nor Lundgren is inconsistent with Florida law. The approach taken by the court in Lundgren--as a matter of federal law--has been followed by several Florida state courts. See Commercial Carrier Corp. v. Indian River County, 371 So.2d 1010, 1023 (Fla.1979) (when complaint fails to allege compliance with section 768.28, court should dismiss claims without prejudice and grant leave to amend); Lee v. South Broward Hosp. Dist., 473 So.2d 1322, 1323-24 (Fla.Dist.Ct.App.1985) (same); Askew v. County of Volusia, 450 So.2d 233, 235 (Fla.Dist.Ct.App.1984) (en banc) (same). While the mootness holding that forms the basis of Fitzgerald has no direct support in the Florida cases, the approach taken is consistent with the cases noted above. Both federal courts in Fitzgerald relied on the Askew opinion. In Askew the court held that a plaintiff complies with section 768.28 even if notice is filed after the original complaint as long as the three year period for giving notice has not expired. 450 So.2d at 235. In addition, the Lee court extended Askew and upheld notice given within the statutory period even though the necessary allegation of notice was not made in court until after the three year period had expired. Finally, we think that the above quoted passage from the district court judge in Fitzgerald presents persuasive reasons for a Florida court faced with the issue in Fitzgerald to adopt that court's approach.
 
 
 47
 In support of his argument that the district court should have granted the motion for a directed verdict, the defendant cites Hardcastle v. Mohr. In Hardcastle, the plaintiff had rested his case without complying with the notice provisions. The defendant then made a motion for a directed verdict. The trial court granted the motion but entered final judgment without prejudice. The Hardcastle court reversed the entry of judgment without prejudice holding:
 
 
 48
 We think the trial judge erred in allowing Mohr to refile his complaint.... Mohr counters that the trial judge properly dismissed his action without prejudice because time remained for him to comply with section 768.28(6). Lee v. South Broward Hospital District, 473 So.2d 1322 (Fla. 4th DCA 1985); Askew v. County of Volusia, 450 So.2d 233 (Fla. 5th DCA 1984).
 
 
 49
 Logic would support Mohr's proposition if Mohr had suffered a dismissal on the pleadings like the plaintiffs in Lee and Askew. Instead, Mohr chose to present his case at trial in the face of the sheriff's affirmative defense of his failure to provide the required notice. Since Mohr did not establish a prima facie case that he had complied with the notice requirement, it was incumbent on the trial judge to render judgment on the merits for the defendant sheriff.
 
 
 50
 483 So.2d at 875 (emphasis added). The defendant points to the emphasized language as supporting his argument for dismissal with prejudice.
 
 
 51
 We find Hardcastle distinguishable from the instant case.[10] In that case the plaintiff rested his case without presenting any evidence of compliance with section 768.28(6). In this case, at the time the that the defendant moved for the directed verdict, the plaintiffs had complied with the statute. In addition, while the plaintiff in Hardcastle proceeded to trial "in the face of the affirmative defense of failure to provide the required notice," 483 So.2d at 875, the plaintiffs in this case removed the issue of compliance with the statute by successfully having the defense stricken before trial. The Hardcastle court explicitly distinguished the Florida cases where the dispute over compliance with section 768.28(6) was adjudicated in pre-trial proceedings. Id. Finally, unlike the plaintiff in this case, the plaintiff in Hardcastle did not ever show that adequate notice had been given. Id. at 874-75.
 
 
 52
 Finally, the defendant argues that the Supreme Court's opinion in Felder changes this analysis. The Felder Court held that Wisconsin's notice of claim provisions were preempted by 42 U.S.C. Sec. 1983 and could not be applied to a suit based on section 1983 in state court. 487 U.S. at 152-53, 108 S.Ct. at 2314. In the context of deciding Felder, the Court noted:
 
 
 53
 Under Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), when a federal court exercised diversity or pendent jurisdiction over state-law claims, "the outcome of the litigation in the federal court should be substantially the same, so far as legal rules determine the outcome of a litigation, as it would be if tried in a State court." Guaranty Trust Co. v. York, 326 U.S. 99, 109, 65 S.Ct. 1464, 1470, 89 L.Ed. 2079 (1945). Accordingly, federal courts entertaining state-law claims against Wisconsin municipalities are obligated to apply the notice-of-claim provision. See Orthmann v. Apple River Campground, Inc., 757 F.2d 909, 911 (CA7 1985).
 
 
 54
 487 U.S. at 151, 108 S.Ct. at 2313. The Defendant contends that the district court erred in not recognizing that this passage from Felder overruled both Fitzgerald and Lundgren. Specifically, he argues that our opinions were decided on the assumption that the Florida notice rule was procedural. As we noted above, the opinion in Fitzgerald is based entirely on state law.[11] Thus, Felder did not overrule Fitzgerald since Felder merely directed this court to apply state law.
 
 
 55
 The defendant also argues that Lundgren is inconsistent with the Supreme Court's opinion in Felder. We reject this argument and reaffirm our opinion in Lundgren as not inconsistent with Felder. The Supreme Court passage quoted above merely noted that these types of provisions are substantive in nature. The Court did not consider the question presented in this case--how and when a plaintiff in federal court must show that he has complied with a state statute. The requirements of section 768.28(6) are an element in the cause of action against certain Florida government agencies. Thus, the issue in this case is analogous to the decision of whether state or federal rules should apply when the defendant has failed to allege any of the elements that comprise a state cause of action. In such cases, it is federal law that determines the resolution of such a complaint. While the Lundgren court's pre-Felder "suggestion" that section 768.28 compliance may be required before a federal court can enter judgment for the plaintiff is likely a "prerequisite" to recovery after Felder, we see nothing in Felder that would mandate consideration of classic procedural requirements such as amendments of complaints and the decision to allow the plaintiff to reopen his case at trial under state law standards.[12] Cf. Reinke v. O'Connell, 790 F.2d 850, 851 (11th Cir.1986) (noting that federal standard for avoiding summary judgment may be stricter than state standard even when cause of action based upon state law).
 
 
 56
 The defendant has pending a motion to certify this issue to the Florida Supreme Court. The defendant argues that the Florida Supreme Court has never addressed the issue in Hardcastle. While this is true, as noted above, Hardcastle is not sufficiently similar to this case to be relevant in this appeal. While we have considered the defendant's suggestion that we certify the mootness issue presented in both Fitzgerald and this case, we decline to do so as we find the Florida precedent sufficient to guide our decision.
 
 B. Consistency of the Verdict
 
 57
 The defendant's second ground for appeal is that the verdict in favor of the plaintiff on the negligence count is inconsistent with the verdicts for the defendant on the constitutional and intentional tort claims. The defendant argues that acquittals on the constitutional and intentional tort claims required the jury to find that the defendant did not force the hose into the plaintiff's mouth. In addition, the defendant characterizes the verdicts as compelling the conclusion that Laird, the only plaintiff's witness who testified to the contrary, must not have been believed by the jury.
 
 
 58
 The plaintiff, on the other hand, argues that the verdicts are consistent. The plaintiff notes that the jury rejected the claims that required proof of some sort of intentional action on the part of the defendant. Instead, the jury found that the defendant's actions constituted negligence--conduct that fell short of intentional action, but below the standard of reasonable care required under the circumstances.
 
 
 59
 In Aquachem Co. v. Olin Co., 699 F.2d 516, 521 (11th Cir.1983), this court noted the standard of review to be applied to a claim that a verdict is inconsistent:
 
 
 60
 The trial court's denial of a motion for a new trial may only be reversed for a clear abuse of discretion. But reversal for new trial is required if one critical answer in a special verdict is inconsistent with another. However, the Seventh Amendment demands that, if there is a view of the case which makes the jury's answers consistent, this Court must adopt that view. It does not matter that [the appellant] can suggest equally plausible reasons for the verdict that would require reversal. The test to be applied in reconciling apparent conflicts between the jury's answers is whether the answers may fairly be said to represent a logical and probable decision on the relevant issues as submitted....
 
 
 61
 Id. (citations and internal quotations omitted). In this case, the plaintiff's characterization of the evidence is both reasonable and consistent with the verdict. While the defendant did introduce evidence indicating that he did not put the hose in the plaintiff's mouth, there was sufficient evidence for the jury to conclude that water was forced into the plaintiff's mouth by the defendant's actions. The jury could reasonably have concluded that the defendant intended to administer first aid rather than commit an intentional or constitutional tort and then based liability on the negligence of the defendant in administering the aid. Applying Aquachem, the negligence verdict is reasonable. The district court's denial of the motion for a new trial is affirmed.
 
 C. Causation
 
 62
 The defendant, in his third ground for appeal, argues that there was insufficient evidence to allow the jury to conclude that his actions were the cause of the plaintiff's injuries. This argument is based upon the defendant's contention that the only evidence presented at trial relating to causation assumed that the Sheriff put the water hose in the plaintiff's mouth. When the experts were asked if the plaintiff's injuries could have been caused by the sheriff lightly spraying water on the outside of the plaintiff's body, they responded in the negative.
 
 
 63
 The defendant's argument, however, is based entirely on the assumption that the jury did not find that the sheriff squirted water in the plaintiff's mouth. We have already rejected this characterization of the verdict. Thus, our finding for the plaintiff on the inconsistency argument, removes the basis for this objection. While we accept the defendant's characterization of the evidence regarding causation is insufficient to support the verdict if the jury did not find that the defendant caused the water to enter Noah Laningham's mouth under high pressure, we reject any suggestion that the jury did not make this finding. We, therefore, refuse to overturn the jury's verdict on the causation issue.
 
 D. The Appealability of the Additur Order
 
 64
 The defendant's fourth argument challenges the order of the additur by the district court. The additur was ordered pursuant to Florida Statutes Sec. 768.74.[13] The district court found that the $2,000,000 damage award by the jury was insufficient under the statute because it appeared (1) that the jury ignored evidence, (2) that the jury speculated as to the amount of damages, (3) that the amount awarded was not reasonably related to the damages proven, (4) that the amount awarded was not supported by the evidence. After making these findings, the court offered the defendant the choice between accepting the additur (resulting in a judgment of $843,603), or having the court enter an order granting a new trial limited to the issues of damages. The defendant accepted the additur "subject to all rights of appeal" (R2-115). In this court the defendant contends that the additur order was unnecessary and excessive as a matter Florida law.[14] The plaintiff argues that Florida law supports the additur.
 
 
 65
 Resolution of this issue on the merits is unnecessary because the parties, have all but ignored several fundamental questions of federal procedure. After considering these issues, we find that we are precluded from reaching the merits of this claim. We begin our discussion with several basic principles. First, as the plaintiff correctly points out, while the issue of the sufficiency of damages awarded on a state claim is determined under state law, federal law governs the decision of whether or not to grant a new trial. Lowe v. General Motors, 624 F.2d 1373, 1383 (5th Cir.1980).[15] Second, we note that a long line of consistent decisions of the United States Supreme Court forbid the plaintiff from accepting a remittitur--even under protest--and then appealing the order granting the remittitur. See Donovan v. Penn Shipping Co., 429 U.S. 648, 649-50, 97 S.Ct. 835, 836-37, 51 L.Ed.2d 112 (1977) (per curiam) (noting cases). This principle applies as a matter of federal procedure in "either a state or federal cause of action." Id. at 650, 97 S.Ct. at 837. Finally, we note that there are no federal cases applying these principles to an additur order. Of course, the paucity of federal precedent is not surprising given the fact that the order of an additur by a federal court violates the seventh amendment right to a jury trial in civil cases.[16] Dimick v. Schiedt, 293 U.S. 474, 486-88, 55 S.Ct. 296, 301, 79 L.Ed. 603 (1935); Hawkes v. Ayers, 537 F.2d 836, 837 (5th Cir.1976). While the district court erred in ordering the defendant to choose between accepting either the additur or a new trial, this court faces several procedural hurdles that block review of that decision. Because we find that the defendant has waived appellate review of the additur order, we leave untouched the district court's judgment on this issue.
 
 
 66
 The defendant's action of accepting the additur "subject to all rights of appeal" availed the defendant nothing. In Donovan, the Court held that acceptance of a remittitur, even under protest, bars appeal of the propriety of the remittitur order. 429 U.S. at 649-50, 97 S.Ct. at 836-37. The rule reaffirmed in Donovan exists to prevent a party from bypassing a new trial and thereby directly appealing the otherwise non-final new trial order. Woodworth v. Chesbrough, 244 U.S. 79, 81-82, 37 S.Ct. 583, 584, 61 L.Ed. 1005 (1917). When the defendant objects to the remittitur, he receives a new trial on the damages issue. That is his only remedy. Of course, that order granting the new trial is not immediately reviewable since it is an interlocutory order. Id. at 82, 37 S.Ct. at 584.
 
 
 67
 Since an additur order by a federal court is unconstitutional, there are not any cases applying Donovan to an additur order. The defendant disputes none of the analysis of Donovan. In the supplementary briefs filed at the request of this court at oral argument, however, the defendant argues that the Donovan rule does not apply to an additur order. In support of this proposition he cites Dimick. The defendant notes that the Dimick plaintiff moved for a new trial on the damages issue. The district court entered an order granting the new trial unless the defendant accepted an additur. The defendant then accepted the additur. On appeal, the Supreme Court then found that the additur order constituted a violation of the seventh amendment. The defendant is correct in noting that the appellate courts did not find a waiver in Dimick. However, in that case, it was not the party accepting the additur who appealed. The Dimick plaintiff was the appellant in the case and had appealed the district court's denial of his motion for a new trial. Thus, unlike Donovan, it was not the party accepting the modified verdict who appealed the order in Dimick. Because the Donovan rule exists to prevent the party agreeing to the adjusted verdict from bypassing the final judgment rule, furtherance of these principles requires application of Donovan to an additur accepted by the defendant.
 
 
 68
 The defendant's means of preserving this issue for appeal was to submit to the re-trial of the damages issue and then appeal the new trial order along with the issues brought on this appeal. The defendant cannot save the issue for review by accepting the additur "subject to all rights of appeal." Such an acceptance amounts to a waiver of appellate review of the additur order.
 
 E. Limitation of the Recovery to $100,000
 
 69
 In his final ground for appeal, the defendant argues that the district court erred by entering judgment in excess of $100,000. In the district court, the defendant filed a motion to limit recovery to $100,000. The trial court denied the motion. The defendant then filed a motion to stay execution which was also denied. Finally, as appellant in this court, the defendant filed a motion for stay of execution without bond. This court granted the stay only with respect to the first $100,000 of the judgment. See Court of Appeals Order of August 8, 1989. In all of these motions and in his brief, the defendant argued that under Florida law sovereign immunity is waived only up to $100,000 unless the legislature makes an appropriation for the remainder of the judgment. This contention is also the subject of the defendant's second request for certification to the Florida Supreme court.
 
 
 70
 The defendant's argument is based on Florida Statutes Sec. 768.28(5).[17] That section contains an explicit waiver of sovereign immunity up to $100,000 per plaintiff or $200,000 per incident. Under the act, judgments in excess of the limits in section 768.28(5) require a legislative appropriation. However, as the plaintiff correctly argues, Florida has adopted a second theory of sovereign immunity waiver. Florida local governments and their agencies are authorized to purchase liability insurance or to enter into self-insurance agreements with other similar agencies. The statutes authorizing this insurance have been interpreted by the Florida courts to be an additional waiver of sovereign immunity up to the limit of the policy. In this case, the defendant is insured by the Florida Sheriffs' Self-Insurance Fund ("Sheriffs' Fund"). In addition, the Sheriffs' Fund has purchased an excess insurance policy providing coverage to the participating Sheriffs for amounts in excess of $100,000 with a $1,000,000 policy limit. The question presented in this case is whether this insurance arrangement constitutes a sovereign immunity waiver apart from general waiver found in section 768.28(5).
 
 
 71
 The plaintiff's argument is based upon Florida Statutes Sec. 286.28 which provides that certain state and local government agencies and departments may purchase liability insurance.[18] Subsection two of this provision requires that a contract of insurance purchased under the authority of that section include a policy provision stating that "the insurer shall not be entitled to the benefit of the defense of sovereign immunity." In Avallone v. Board of County Commissioners of Citrus County, 493 So.2d 1002, 1004 (Fla.1986), the court held that section 286.28(2) constituted a waiver of sovereign immunity up to the limits of the policy purchased pursuant to the provision. This waiver of immunity is a waiver that is in addition to the waiver in section 768.28(5). Id.
 
 
 72
 It is not clear from the face of section 286.28 whether the provision allows a sheriff to purchase insurance. Florida Statutes Sec. 30.55, however, explicitly provides authority for the purchase of liability insurance by Florida sheriffs.[19] Subsection 2 of this provision is practically identical to section 286.28(2). If there was any question that the Avallone doctrine applied to the sheriffs in Florida, the Florida Supreme Court settled the issue in its decision in Kaisner v. Kolb, 543 So.2d 732 (Fla.1989). In Kaisner, the Florida Supreme Court reversed the district court of appeals' refusal to apply Avallone to discretionary functions; in doing so the court held:
 
 
 73
 [W]e disagree with the district court's holding that the enactment of section 286.28, Florida Statutes (1985), did not waive governmental immunity up to the limits of insurance coverage.... This contingent waiver operates independently of the general waiver of sovereign immunity and would be sufficient to allow recovery up to the limits of coverage in this instance provided the elements of negligence are properly found to exist.
 
 
 74
 Kaisner v. Kolb, 543 So.2d 732, 738 (Fla.1989). The court did not address the district court's holding that section 30.55 and section 286.28 were to be treated identically for the purposes of applying Avallone.[20] Nevertheless, because the court explicitly applied the Avallone doctrine to insurance purchased by Florida sheriffs, we need not concern ourselves with the question of whether the authority for the purchases was contained in section 30.55 or section 286.28.
 
 
 75
 The defendant argues that the above analysis is inapplicable to the instant case since the Sheriff was a member of a self-insurance pool rather than a purchaser of insurance.[21] The defendant argues that the Florida Supreme Court in Hillsborough County Hospital and Welfare Board v. Taylor, 546 So.2d 1055 (Fla.1989) exempted self insurance pools from the waiver of immunity doctrine of Avallone, and therefore, the Avallone waiver is not applicable in this case.
 
 
 76
 The record confirms that the defendant is a member of the Florida Sheriffs' Self-Insurance Fund "the Sheriffs' Fund", a risk pool authorized under 768.28(13). The Sheriffs' Fund insures the member Sheriffs for liabilities up to $100,000. In addition, the Sheriffs' Fund has purchased a $1,000,000 excess liability from a syndicate of insurers (R2-102). Apparently, the defendant's argument is that since he did not purchase the policy, Avallone does not apply and Hillsborough Hospital does.[22] In Avallone the court held that the authorization by the legislature for the purchase of insurance implied that the legislature saw some value to the taxpayers in the state's departments having liability insurance. 493 So.2d at 1004. If the agency was not liable for amounts greater than $100,000, the court reasoned, then all policies purchased that provided coverage for losses in excess of the $100,000 limit were merely a waste of money. Id. In Hillsborough Hospital the court exempted self-insurance pools from the Avallone waiver. The holding was based on the simple proposition that one can purchase insurance or be self-insured. Id. at 1057-58. If insurance is purchased, the insurance company cannot urge as a defense the state agency's immunity. If insurance is not purchased and the agency self-insures, as was the case in Hillsborough Hospital, the agency is entitled to section 768.28(5) immunity.
 
 
 77
 We find the present case distinguishable from the situation in Hillsborough Hospital. When the Sheriffs' Fund purchases insurance it does so with taxpayer dollars, and therefore, the Avallone considerations are applicable. In effect, when the Sheriffs' Fund purchases insurance, the Sheriffs are purchasing insurance. In addition, we note that the Hillsborough Hospital court explicitly recognized the fact that the Avallone waiver applied when "there was (1) a contract for insurance supported by consideration [which was] (2) [purchased] from an insurer." 546 So.2d at 1058. While the self-insurance pool in Hillsborough Hospital did not meet this test, the insurance purchased by the Sheriffs' Fund from a syndicate of insurers does. Finally, we note that the provisions of section 768.28(13) at issue in Hillsborough Hospital only authorize a self-insurance pool to pay claims "which [the agency] may be liable to pay pursuant" to $100,000 waiver of sovereign immunity in section 768.28. Therefore, because the insurance purchased by the Sheriffs' Fund only covers liabilities in excess of the section 768.28 waiver, the authority to purchase this insurance cannot come from section 768.28(13), and Hillsborough Hospital, therefore, can not be applicable.
 
 
 78
 The sheriffs in Florida have elected to set up a self-insurance pool to pay claims up to $100,000. The holding in Hillsborough Hospital prevents an individual plaintiff from recovering more than $100,000 from the money in this fund. The Sheriff's Self-Insurance Fund, however, has taken some of the moneys in this fund and purchased an insurance policy for liabilities in excess of the $100,000 waiver found in section 768.28(5). The statutes that allow the sheriffs to purchase this insurance have been interpreted as a waiver of sovereign immunity up to the amount of the policy. Consequently, the fund's purchase of the $1,000,000 policy constitutes a waiver of sovereign immunity up to that amount.[23] The district court correctly refused to limit the judgment to $100,000.[24]
 
 
 79
 Because we reject each of the five grounds that the defendant presents for overturning the judgment of the district court, the judgment of that court is AFFIRMED.
 
 
 
 [1]
 The complaint alleged four counts against the defendant. Count I was a 42 U.S.C. Sec. 1983 action alleging violations of the fourth, fifth, eighth, and fourteenth amendments. Count II alleged assault and battery. Count III alleged intentional infliction of extreme emotional distress. Finally, Count IV alleged negligence. Counts II-IV were state law claims based upon pendant jurisdiction
 
 
 [2]
 This order was entered despite the fact that the defendant was sued in both his official and individual capacities. The record does not indicate the basis for this order
 
 
 [3]
 The 1988 amendments concerned matters not relevant to this appeal. In any event, amendments to the immunity waiver in section 768.28 have not been applied retroactively. When determining whether there has been a waiver of sovereign immunity, the courts should look at the immunity provisions in effect at the time the cause of action accrued. Kaisner v. Kolb, 543 So.2d 732, 738 (Fla.1989)
 
 
 [4]
 The court's order granting the motion to strike the defense was filed on May 31, 1988. Felder was decided on June 22, 1988. The motion to reinstate the defense was filed on August 4, 1988
 
 
 [5]
 We note that as a panel we are generally bound by prior decisions of this court unless the court sitting en banc overrules the prior decision. We see no reason to depart from this rule when the prior decision involves interpretations of state law. Of course, if subsequent decisions of the United States Supreme Court or the Florida courts cast doubt on our interpretation of state law, a panel would be free to reinterpret state law in light of the new precedents
 
 
 [6]
 As in this case, the plaintiff in Lundgren gave the requisite notification, but did not wait the required six months before filing suit. 814 F.2d at 605
 
 
 [7]
 The court noted that the issue of whether the defendants would be entitled to a protective order prohibiting discovery before compliance with the six month waiting period and the issue of whether a judgment could be entered before the six month period had passed may be considered substantive for Erie purposes. Id
 
 
 [8]
 The court "doubt[ed] that Florida law prohibit[ed] ... a trial court from waiting until the expiration of the six month period after notification, and then permitting plaintiff to file an amended complaint." Id. at 606
 
 
 [9]
 In Hardcastle v. Mohr, 483 So.2d 874 (Fla.Dist.Ct.App.1986), the Florida case cited by the Lundgren defendants as allegedly barring the plaintiff from reopening her case was characterized by the court as "distinguishable." Id
 
 
 [10]
 We note that the Lundgren court also characterized Hardcastle as "distinguishable." 814 F.2d at 607
 
 
 [11]
 The defendant argues that Fitzgerald was based upon the reasoning of Lundgren which does decide a similar question on the basis of federal procedure. This argument is without merit. While Fitzgerald cites to Lundgren, it does so in the context of immunity from suit on federal claims. See Fitzgerald, 833 F.2d at 1520. That Fitzgerald's interpretation of section 768.28(6) is based entirely on state law is evident from the fact that the court's discussion of the issue only cites state authority. See id. at 1519-20
 
 
 [12]
 We note that this holding is based upon our conclusion that state law allows the plaintiff to meet her burden under section 768.28(6) if the initial non-compliance with the section is cured before trial. See Commercial Carrier, supra; Lee, supra; Askew, supra. If however, the plaintiff can not comply because the time period has expired or simply does not comply before trial, judgment should be issued for the defendant with prejudice. See, e.g., Levine v. Dade County School Board, 442 So.2d 210, 212-13 (Fla.1983) (when three years pass from time cause of action accrues without notice being given, court should dismiss claims with prejudice); Dukanauskas v. Metropolitan Dade County, 378 So.2d 74, 76 (Fla.App.1979) (same). In such a case the non-compliance would be tantamount to a plaintiff failing to prove any other element of a state cause of action
 
 
 [13]
 That section provides:
 (1) In any action to which this part applies wherein the trier of fact determines that liability exists on the part of the defendant and a verdict is rendered which awards money damages to the plaintiff, it shall be the responsibility of the court, upon proper motion, to review the amount of such award to determine if such amount is excessive or inadequate in light of the facts and circumstances which were presented to the trier of fact.
 (2) If the court finds that the amount awarded is excessive or inadequate, it shall order a remittitur or additur, as the case may be.
 (3) It is the intention of the Legislature that awards of damages be subject to close scrutiny by the courts and that all such awards be adequate and not excessive.
 (4) If the party adversely affected by such remittitur or additur does not agree, the court shall order a new trial in the cause on the issue of damages only.
 (5) In determining whether an award is excessive or inadequate in light of the facts and circumstances presented to the trier of fact and in determining the amount, if any, that such award exceeds a reasonable range of damages or is inadequate, the court shall consider the following criteria:
 (a) Whether the amount awarded is indicative of prejudice, passion, or corruption on the part of the trier of fact;
 (b) Whether it appears that the trier of fact ignored the evidence in reaching a verdict or misconceived the merits of the case relating to the amounts of damages recoverable;
 (c) Whether the trier of fact took improper elements of damages into account or arrived at the amount of damages by speculation and conjecture;
 (d) Whether the amount awarded bears a reasonable relation to the amount of damages proved and the injury suffered; and
 (e) Whether the amount awarded is supported by the evidence and is such that it could be adduced in a logical manner by reasonable persons.
 Fla.Stat.Ann. Sec. 768.74 (West Supp.1970).
 
 
 [14]
 The defendant contends that the jury was free not to believe the experts who testified on the issue of damages. In addition, the defendant argues that the testimony indicating that Laningham had a history of drug abuse and that his condition had worsened after his appendix burst caused the jury to reduce the level of damages. The defendant also argues that the jury could have found that some of the treatment expenses were unnecessary. Finally, the defendant argues that the partial new trial was an abuse of discretion in the face of the circumstances indicating that the jury rendered a compromise verdict
 
 
 [15]
 In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir.1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. Id. at 1209
 
 
 [16]
 The seventh amendment provides:
 In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law.
 U.S. Const.Amend. VII. Although the seventh amendment does not apply to state court proceedings, it is applied when federal courts determine state claims. See Byrd v. Blue Ridge Rural Electric Cooperative, 356 U.S. 525, 537-38, 78 S.Ct. 893, 901, 2 L.Ed.2d 953 (1958).
 
 
 [17]
 At the time of the incident giving rise to the plaintiff's claim, this provision provided:
 The state and its agencies and subdivisions shall be liable for tort claims in the same manner and to the same extent as a private individual under like circumstances.... Neither the state nor its agencies or subdivisions shall be liable to pay a claim or a judgment by any one person which exceeds the sum of $100,000.... However, a judgment or judgments may be claimed and rendered in excess of [$100,000] and that portion of the judgment that exceeds [$100,000] may be reported to the Legislature, but may be paid in part or in whole only by further act of the Legislature.
 Fla.Stat.Ann. Sec. 768.28(5) (West 1986), amended, 1987 Fla.Laws Ch. 134, Sec. 3 (effective June 30, 1987). The amendment added the following qualification:
 Notwithstanding the limited waiver of sovereign immunity provided herein, the state or an agency or subdivision thereof may agree, within the limits of insurance coverage provided, to settle a claim made or a judgment rendered against it without further action by the Legislature, but the state or agency or subdivision thereof shall not be deemed to have waived any defense of sovereign immunity or to have increased the limits of its liability as a result of its obtaining insurance coverage for tortious acts in excess of the $100,000 ... waiver provided above.
 Fla.Stat.Ann. Sec. 768.28(5) (West Supp.1989) (emphasis added).
 While the amendment seemingly supports the defendant's argument that liability should be limited to $100,000, the Florida Supreme Court has held that the legislature's attempt to apply the amendment to cases in which a judgment had not yet been obtained violated the Florida Constitution. Kaisner v. Kolb, 543 So.2d 732, 738 (Fla.1989). Consequently we apply the section as it existed at the time the cause of action accrued.
 
 
 [18]
 This section provides:
 (1) The public officers in charge or governing bodies, as the case may be, of every county, district school board, governmental unit, department, board, or bureau of the state, including tax or other districts, political subdivisions, and public and quasi-public corporations ... of the several counties and the state, all hereinafter referred to as political subdivisions, which political subdivisions in the performance of their necessary functions ... perform operations in the state or elsewhere are hereby authorized, in their discretion, to secure and provide for such respective political subdivisions, and their agents and employees while acting within the scope of their employment, insurance to cover liability for damages on account of bodily or personal injury or death resulting therefrom to any person, or to cover liability for damage to the property of any person or both, arising from ... such operations, whether from accident or occurrence; and to pay the premiums therefor from any general funds appropriated or made available for the necessary and regular expense of operations of such respective political subdivisions, without the necessity of specific appropriation or specification of expense with respect thereto....
 (2) In consideration of the premium at which such insurance may be written, it shall be a part of any insurance contract providing said coverage that the insurer shall not be entitled to the benefit of the defense of governmental immunity of any such political subdivisions of the state in any suit instituted against any such political subdivision as herein provided, or in any suit brought against the insurer to enforce collection under such an insurance contract; and that the immunity of said political subdivision against any liability described in subsection (1) as to which such insurance coverage has been provided, and suit in connection therewith, are waived to the extent and only to the extent of such insurance coverage....
 Fla.St.Ann. Sec. 286.28 (West 1975), repealed 1987 Fla.Laws Ch. 134, Sec. 4 (effective June 30, 1987).
 
 
 [19]
 This section provides:
 (1) The sheriffs of the counties are hereby authorized in their discretion to secure and provide for insurance to cover liability for damages arising out of claims for false arrests, false imprisonment, false or improper service of process, or other claims growing out of the performance of the duties of the sheriffs or their deputies, or their employees; and to pay the premiums therefor from the funds appropriated and made available for the necessary and regular expenses of the offices without the necessity of specific appropriation or specification of expenses with respect thereto.
 (2) In consideration for the premiums for such insurance, it shall be the part of any insurance contract providing such coverage that the insured shall not be entitled to the benefit defense of government immunity in any suit resulting against the sheriff, his deputies or employees, or in any suit brought against the insurers to enforce collection under such contract.
 Fla.Stat.Ann. Sec. 30.55 (West 1988), repealed, 1987 Fla.Laws Ch. 134 Sec. 4 (effective June 30, 1987).
 
 
 [20]
 The district court of appeals had held that because of the similarity between section 286.28 and section 30.55, "the reasoning of Avallone is applicable" to insurance purchased under the authority of section 30.55. 509 So.2d 1213, 1219 (1987)
 
 
 [21]
 Florida Statutes Sec. 768.28(13) authorized this practice. It provided:
 The state and its agencies and subdivisions are authorized to be self-insured, to enter into risk management programs, or to purchase liability insurance for whatever coverage they may choose, or to have any combination thereof, in anticipation of any claim, judgment, and claims bills which they may be liable to pay pursuant to this section. Agencies or subdivisions, and sheriffs for the purpose of police professional liability only, which are subject to homogeneous risks may purchase insurance jointly or may join together as self-insurers to provide other means of protection against tort claims, any charter provisions or laws to the contrary notwithstanding. Sheriffs may join together as self-insurers to provide coverage for police professional liability claims only.
 Fla.Stat.Ann. Sec. 768.28(13) (West 1986) (amended in a manner not relevant effective July 1, 1986 and July 6, 1989 and redesignated Fla.Stat.Ann. Sec. 768.28(14) (West Supp.1990)).
 
 
 [22]
 The assumption underlying this argument is that the sheriff has no connection to the policy. We note, however, that the individual sheriffs' departments participating in the Sheriffs' Fund are explicitly included in the definition of those considered as "insured" under the policy at issue in this case. Thus, while the Sheriffs' Fund itself is insured by the policy, so are the individual sheriffs who are members of the Sheriffs' Fund
 
 
 [23]
 The defendant places much significance on the fact that the excess liability policies do not contain the waiver language required by both section 30.55(2) and section 286.28(2). We refuse to place any significance in the parties failure to include these contractual provisions. The policy does provide that persons who secure a judgment against the insured sheriffs shall be entitled to recover under the policy. In addition, we note that Florida law includes required policy provisions as part of every insurance contract whether or not the provisions appear in the insurance policy. Department of Insurance v. Teachers Insurance Co., 404 So.2d 735, 741 (Fla.1981)
 
 
 [24]
 As with the question of whether the notice of claim issue should be certified to the Florida Supreme Court, we find that the applicable state precedent is sufficient to render a decision on this issue, and, we, therefore, decline to certify this question to the Florida Supreme Court